**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | |
|---|---|
| LEGACY GYMNASTICS, LLC, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. 20-cv-4214-NKL |
| v. | Class Action |
| ARCH INSURANCE COMPANY, | DEMAND FOR JURY TRIAL |
| Defendant. | |

**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, Plaintiff Legacy Gymnastics, LLC ("Plaintiff"), individually and on behalf of all others similarly situated, hereby files as a matter of course its First Amended Class Action Complaint against Defendant Arch Insurance Company ("Arch" or "Defendant"), and states and alleges as follows:

**SUMMARY OF ACTION**

1.      This action arises out of a coverage dispute between Defendant and Plaintiff over Plaintiff's ongoing direct physical loss of or damage to property and resultant economic losses arising from the Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2 or the Coronavirus) and the Coronavirus Disease 2019 (COVID-19) pandemic under the "all-risk" commercial property insurance policy Defendant sold to Plaintiff (the "Policy"). The Policy broadly cover all risks of direct physical loss of or damage to property from any cause unless excluded. Neither virus nor communicable disease are excluded causes of loss under the Policy. Despite this, Defendant has failed and refused to acknowledge coverage on Plaintiff's claim arising from the Coronavirus and the COVID-19 pandemic.

1

2. As of March 11, 2020, the extent of COVID-19 infection caused by the Coronavirus was declared a pandemic by the World Health Organization. According to the Coronavirus Resource Center at Johns Hopkins University (available at: https://coronavirus.jhu.edu/ (last visited February 15, 2021)), there have been nearly 110 million global confirmed cases of COVID-19 and over 2.4 million global deaths. In the United States, there have been over 27 million confirmed cases of COVID-19 and over 480,000 deaths. The numbers continue to rise daily.

3. Plaintiff is located in Lexington, Kentucky and offers gymnastics, cheerleading, and dance programs for children of all ages in its 70,000+ square foot facility.

4. Plaintiff is representative of businesses impacted by the presence of the Coronavirus and the ongoing COVID-19 pandemic. Due directly to the presence of the Coronavirus and the COVID-19 pandemic, in March 2020, Plaintiff shuttered and completely suspended operations. Plaintiff has since reopened but continues to suffer lost revenues and increased costs as a result of the Coronavirus and the COVID-19 pandemic.

5. To date, there have been nearly 400,000 confirmed cases of COVID-19 in Kentucky and over 4,200 deaths. In Fayette County, where Plaintiff's insured property is located, there have been over 31,000 reported cases of COVID-19 and over 200 deaths.

6. Employees and clients of Plaintiff have tested positive for COVID-19 in close temporal proximity to having been on Plaintiff's premises and/or having used or been near Plaintiff's equipment and other contents of its facility.

7. Plaintiff submitted a claim to Defendant for physical loss of or damage to property and resulting business interruption and other covered losses and damages attributable to the presence of the Coronavirus and the COVID-19 pandemic, asking for Defendant's confirmation as to coverage with respect to each and every potentially applicable basis for coverage under all

provisions of the Policy. Yet, Defendant has refused to honor its promise to provide the protection that Plaintiff purchased.

8. Defendant's position on coverage under the Policy is wrong as to Plaintiff and all other similarly situated businesses. Contrary to Defendant's position, the Policy provides coverage for Plaintiff's claims arising from the Coronavirus and the COVID-19 pandemic and no exclusions apply. The same is true for all similarly situated businesses with respect to their claims arising from the Coronavirus and the COVID-19 pandemic.

9. Defendant's denial of Plaintiff's claims for coverage is not unique. Based on other lawsuits and other publicly available information, it appears the insurance industry is taking a uniform approach to the current pandemic: deny coverage even when the policy they drafted and offered to insureds, and the policy paid for by the insureds, does not contain an exclusion for pandemic-related losses. Plaintiff's Policy with Defendant does not have virus exclusions and Defendants' response exemplifies the broken promise from insurance companies across the country.

10. Defendant's conduct is particularly galling in light of the huge amount of premiums insurers like Defendant receive annually. According to information published by the Insurance Information Institute, the U.S. insurance industry collected net premiums of $1.22 trillion in 2018. Premiums recorded by property/casualty insurers accounted for 51% of that amount. Between 2014 and 2018, these insurers wrote net premiums each year of between $497 billion to $612.6 billion but only incurred losses of between $277.7 billion and $360.9 billion.

11. This is a class action for declaratory judgment and breach of contract. Plaintiff, individually and on behalf of a class of similarly situated insureds, seeks a declaration as to the scope and breadth of the parties' rights and obligations under the Policy in connection with

Plaintiff's ongoing losses and Defendant's failure and refusal to acknowledge coverage. Should the Court determine that Defendant's coverage position is wrong, Plaintiff, individually and on behalf of a class of similarly situated insureds, seeks damages for Defendant's breach of contract for its failure to honor its obligations under the Policy.

## PARTIES

12.     Plaintiff Legacy Gymnastics, LLC is a Kentucky limited liability company with its principal place of business in Lexington, Kentucky.

13.     The Policy covers Plaintiff's 70,000+ square foot gym facility located at 261 Ruccio Way, Lexington, Kentucky.

14.     Defendant Arch Insurance Company, is a Missouri corporation, with its principal place of business in Jefferson City, Missouri

## JURISDICTION AND VENUE

15.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. 1332(a) because the parties are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action in which at least one member of the class is a citizen of a state different from Defendant, the amount in controversy exceeds $5 million exclusive of interest and costs, and the proposed classes contain more than 100 members.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant is incorporated and has its principal place of business in the State of Missouri.

## FACTUAL BACKGROUND

17.     As a result of the Coronavirus and the COVID-19 pandemic, including the presence of the Coronavirus and the COVID-19 disease on Plaintiff's insured property and in surrounding

areas, Plaintiff ceased normal operations in mid-March 2020 and have not yet been able to resume normal operations and use of its insured property in the same manner as it had prior to the COVID-19 pandemic.

18. Specifically, Plaintiff ceased normal operations and effectively closed its facility in mid-March 2020 and has not yet been able to resume normal operations and use of its insured property in the same manner as it had prior to the COVID-19 pandemic.

19. The SARS-CoV-2 virus that causes COVID-19 has a physical presence. It can exist in the air, on surfaces and on objects for indeterminate periods of time and can be transferred from the air, surfaces and objects into human bodies. When present in the air, on surfaces and on objects, the SARS-CoV-2 virus makes the air and those surfaces and objects dangerous transmission mechanisms for COVID-19. Accordingly, the presence of the Coronavirus and COVID-19 in and on property, including in the air, on surfaces and on objects, causes direct physical loss of or damage to property by causing physical harm to and altering property and eliminating the utility and habitability of such property or otherwise making it incapable of being used for its intended purpose.

20. The omnipresence of Coronavirus and COVID-19 is enabled by multiple modes of viral transmission, including respiratory droplet, airborne, and fomite transmission (i.e., transmission from surfaces and objects). These transmission methods further demonstrate that Coronavirus and/or COVID-19 cause direct physical loss of or damage to property.

21. The SARS-CoV-2 virus was and has been physically present on Plaintiff's insured property and in surrounding areas since at least March 2020. During Plaintiff's normal operations, there are hundreds of participants, parents, and instructors on Plaintiff's property on a daily basis.

5

Given the nature of the virus and its community spread (as more fully discussed below), persons infected with COVID-19 have been present on Plaintiff's facility and equipment.

22.     By the time Plaintiff closed in mid-March, the SARS-CoV-2 virus and the resulting COVID-19 disease had been present on Plaintiff's insured property and equipment and in surrounding areas – and presented an existing and continuing threat to persons and property at those locations, a dangerous condition by any measure.

23.     The SARS-CoV-2 virus has been present in the air and on surfaces on property adjacent to and near Plaintiff's property and in the surrounding community, which impacted Plaintiff's and others' ability to access and use their property.

24.     The presence of the SARS-CoV-2 virus on Plaintiff's and other nearby property and in the air at such property physically altered such property and air and transformed them into dangerous COVID-19 disease transmission mechanisms sufficient to constitute direct physical loss of or damage to property within the meaning of the Policy.

25.     The presence of the SARS-CoV-2 virus on Plaintiff's and other nearby property and in the air at such property effectively eliminates the utility and habitability of such property sufficient to constitute direct physical loss of or damage to property within the meaning of the Policy.

26.     The imminent risk of the presence of the SARS-CoV-2 virus on Plaintiff's and other nearby property and in the air at such property effectively eliminates the utility and habitability of such property sufficient to constitute direct physical loss of or damage to property within the meaning of the Policy.

27.     Plaintiff's insured property has been subject to a variety of COVID-19-related limitations, restrictions, and prohibitions, including by orders issued by national, state and local

6

governments in response to the presence of the Coronavirus and the COVID-19 pandemic (sometimes referred to as "Stay at Home Orders"), which are matters of public record.

28.     Thus, Plaintiff sustained direct physical loss of or damage to covered property as a result of the SARS-CoV-2 virus and the COVID-19 pandemic; thereby triggering coverage under the Policy for Plaintiff's resultant economic losses, including as covered by the Policy's Property Damage, Business Income, Extra Expense, Civil Authority, and other coverages.

29.     The condition of Plaintiff's insured property and equipment has not returned to its condition pre-occurrence. The presence of the Coronavirus and the ongoing COVID-19 pandemic has caused Plaintiff to suffer substantial losses. For example, Plaintiff has lost revenue from the cancelation of and inability to provide normal services and programs. And, although Plaintiff has since re-opened its facilities and equipment, Plaintiff has incurred substantial costs to clean and remove the Coronavirus from equipment in the facility to ensure it is safe for customers, patrons and staff. To be clear, the measures that must be taken to remove Coronavirus are significant and far beyond routine or ordinary cleaning.

30.     Specifically, and as just one example, Plaintiff's property includes several "foam pits" consisting of thousands of pieces of foam providing a soft surface onto which students can land safely, reducing the risk of injury. The Coronavirus and COVID-19 has been present on this foam, like the other equipment on Plaintiff's premises, since at least March 2020.  The foam in these pits must be removed and replaced because the Coronavirus and COVID-19 cannot be cleaned and/or removed from it. Plaintiff has covered these "foam pits" and completely prohibited their use during the pandemic.  Plaintiff intends to eventually replace the costly foam, once the foam pits become safe for use again. The replacement cost is covered by the Policy.

7

## THE CORONAVIRUS AND COVID-19 PANDEMIC

31.     The SARS-CoV-2 virus has spread widely and rapidly across the United States. Evolving evidence indicates that the SARS-CoV-2 virus, responsible for COVID-19, was present in the United States as early as December 2019. Although the virus and related illness are distinct, for purposes of this First Amended Class Action Complaint, Plaintiff sometimes refers to both interchangeably as "COVID-19."

32.     COVID-19 is highly contagious, uniquely resilient, and potentially deadly.

33.     As early as February 26, 2020, the Centers for Disease Control and Prevention (CDC) advised that COVID-19 was spreading freely and without the ability to trace the origin of new infections, also known as communication transmission.

34.     On March 11, 2020, the WHO declared COVID-19 to be a pandemic. As such, the COVID-19 disease and is causative virus, SARS-CoV-2, are presumed to be present or imminently present everywhere by that time.

35.     While early in the pandemic, testing was limited, and thus potentially thousands more were infected than were reported; with respect to the testing that was available, positivity rates clearly demonstrated the pervasiveness of Coronavirus by March 2020.

36.     A growing body of evidence suggests that the virus transmits both through droplets, when someone sneezes and coughs, and aerosols, which are produced by normal breathing.

37.     Aerosols are particularly concerning because unlike droplets, which stay airborne for only a few seconds, aerosols are water droplets suspended in air and can remain suspended for hours, until gravity ultimately forces them to the nearest surface below.

38.     Consequently, aerosols can spread widely through air flow and settle on surfaces hundreds of feet away from any infected individual. Thus, someone not even in the vicinity of an

8

infected person can unknowingly touch an infected surface, later touch their face, and become infected.

39. As a result, at least 42 states and countless local governments issued substantially similar "stay at home" orders, the purpose of which was to address the presence of the Coronavirus and spread of COVID-19.

40. According to the CDC, everyone is at risk of getting COVID-19. The virus can spread by respiratory droplets when an infected person coughs, sneezes, or talks. A person can become infected from respiratory droplets or potentially by touching a surface or object that has the virus on it and then by touching the mouth, nose, or eyes.[1]

41. According to studies, the virus can live on surfaces for several days if not longer.[2] The New England Journal of Medicine reported finding that experimentally-produced aerosols containing the virus remained infectious in tissue-culture assays, with only a slight reduction in infectivity during a 3-hour period of observations. "Aerosols from infected persons may therefore pose an inhalation threat even at considerable distances and in enclosed spaces...."[3]

42. The study also found that the Coronavirus was detectable for up to four hours on copper, up to 24 hours on cardboard, and up to three days on plastic and stainless steel.[4]

43. All of these materials, and others similarly susceptible to the Coronavirus, are used by Plaintiff throughout its facilities and operations.

---

[1] https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf
[2] https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf
[3] https://www.nejm.org/doi/full/10.1056/NEJMc2009324
[4] https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces

9

44.   The study's results indicate that individuals can become infected with COVID-19 through indirect contact with surfaces or objects used by an infected person, whether they were symptomatic or not.

45.   A consensus appears to be emerging that Coronavirus can travel through the air via aerosols. For example, aerosol scientist Lidia Morawska of the Queensland University of Technology in Brisbane, Australia told *Nature* that, "In the minds of scientists working on this, there's absolutely no doubt that the virus spreads in the air. This is a no-brainer."[5]

46.   An April 2020 study published in the journal *Emerging Infectious Diseases* found a wide distribution of Coronavirus on surfaces and in the air about *13 feet* from patients in two hospital wards in Wuhan, China, leading the authors to conclude that the virus spreads in aerosols in addition to large respiratory droplets. The investigators found evidence of the virus in swabs of floors, computer mice, trash bins, bed handrails, patients' face masks, health workers' personal protective equipment, and air vents.[6]

47.   The authors also surmised that the high rate of positivity for floor samples in the hospital strongly suggest that droplets fall to the ground and then are spread via footwear contacting the droplets on the ground. For example, every sample tested from the pharmacy floor tested positive for Coronavirus even though no patients were housed there.[7]

48.   Another study conducted in Wuhan indicates that staff movement, floor cleaning, and the removal of personal protective equipment could transmit Coronavirus through the re-suspension of virus-contaminated aerosols.[8]

---

[5]     https://www.nature.com/articles/d41586-020-00974-w

[6]     https://www.cidrap.umn.edu/news-perspective/2020/04/study-finds-evidence-covid-19-air-hospital-surfaces

[7]     https://www.cidrap.umn.edu/news-perspective/2020/04/study-finds-evidence-covid-19-air-hospital-surfaces

[8]     https://www.biorxiv.org/content/10.1101/2020.03.08.982637v1

49. Kimberly Prather, an aerosol chemist at the University of California, San Diego told *Science* magazine: "I'm relieved to see aerosolization is accepted. This added airborne pathway helps explain why it is spreading so fast."[9]

50. Aerosol particles are held in the air by physical and chemical forces. The suspended particles remain for *hours or more*, depending on factors such as heat and humidity. If virus particles can be suspended in air for more than a few seconds, like, for instance, the measles virus can, then anyone passing through could become infected by a pathogenic aerosol cloud. And the virus can travel long distances and land on surfaces, only to be stirred back up into the air later by cleaning or other disturbances.

51. In a study published on October 7, 2020, researchers at Australia's national science agency found that Coronavirus can survive for up to 28 days on common surfaces like cash, glass, vinyl, and stainless steel.[10] The study also determined that the virus survives longer at colder temperatures, a particular concern during the winter in the United States.

52. Dr. Debbie Eagles, one of the Australia study's lead researchers, said: "Our results show that SARS-CoV-2 can remain infectious on surfaces for long periods of time, reinforcing the need for good practices such as regular handwashing and cleaning surfaces."[11]

53. The SARS virus that caused a 2003 epidemic is a coronavirus and is similar to the Coronavirus. As a result, the behavior of SARS during the 2003 epidemic provided evidence about any aerosol risk from Coronavirus.

54. A 2014 analysis published in the journal *Clinical Infectious Diseases* investigated a seemingly puzzling outbreak in a Hong Kong apartment complex whose residents had not been

---

[9]  https://www.sciencemag.org/news/2020/04/you-may-be-able-spread-coronavirus-just-breathing-new-report-finds#
[10]  https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7
[11]  https://www.sciencedaily.com/releases/2020/10/201011220759.htm

11

in close contact with each other.[12] The study found that "airborne spread was the most likely explanation, and the SARS coronavirus could have spread over a distance of 200 meters," or about 600 feet.[13]

55.     The implications of airborne spread of Coronavirus are extremely serious. Airborne spread means that the virus can travel long distances from any infected person. It can then infect someone who unknowingly walks through a pathogenic cloud. It can also infect someone by settling on a physical surface, which someone touches and later becomes infected. And regardless of the transmission method, the evidence suggests that COVID-19 can be transmitted by shoes even once it reaches the ground.

56.     At various times, national, state and local governments issued orders to address the presence of the Coronavirus and the COVID-19 pandemic, and the direct physical loss of or damage that they were inflicting upon property and lives, all as reflected in the very text and context of these orders.

57.     The Coronavirus and COVID-19 caused Plaintiff to undertake additional cleaning and decontamination measures and to follow disease mitigation advice from the CDC and other public health agencies.[14] The CDC and other public health agencies recommended and continue to recommend enhanced cleaning and other disease mitigation measures (like social distancing) to combat the pandemic spread of COVID-19.[15] This has caused Plaintiff to incur increased costs to clean and decontaminate its property. Physical distancing measures have also been costly for Plaintiff to implement and have yielded reduced capacities of Plaintiff's insured property.

---

[12]     https://academic.oup.com/cid/article/58/5/683/365793
[13]     *Id.*
[14]     *E.g.*, https://www.cdc.gov/coronavirus/2019-ncov/community/clean-disinfect/index.html; https://www2.illinois.gov/ Pages/Executive-Orders/ExecutiveOrder2020-10.aspx
[15]     *E.g.*, https://www.cdc.gov/coronavirus/2019-ncov/community/reopen-guidance.html

*The SARS-CoV-2 Virus Causes Actual Physical Damage, Including Adverse Alteration*

58.     When SARS-CoV-2 viral particles come in contact with property, that property suffers actual physical damage, including adverse alteration.

59.     To understand why the SARS-CoV-2 virus has had such devastating health consequences and also has resulted in so much physical loss and damage to property and so many government-ordered or privately undertaken business shutdowns, one must understand the manner in which the virus interacts with the physical environment. This further illustrates whySARS-CoV-2 triggers the insurance protection provided by Plaintiff's Policy.

60.     The SARS-CoV-2 virus is expelled from the mouth and/or nose, and it travels within respiratory droplets when humans cough, sneeze, scream, sing, or even speak loudly or breathe heavily.

61.     Mouth and nose secretions, including saliva, nasal discharge, and respiratory secretions such as mucus, form an aerosol cloud in the surrounding air. The expelled aqueous droplets contain multiple copies of suspended infectious SARS-CoV-2 viral particles. The mouth- and nose- emitted droplets are approximately spherical in shape and widely vary by size. Scientific literature somewhat arbitrarily divides these droplets into "small" droplets (those less than about 5 microns in diameter) and "large" droplets (those exceeding about 5 microns in diameter). Because the SARS-CoV-2 viral particle diameter is roughly 100 nanometers (*i.e.*, 0.1 microns) even a 5-micron respiratory droplet can easily accommodate ***many thousands*** of SARS-CoV-2 viral particles.

62.     Droplet size is the most important determinant of aerosol behavior, including the length of travel of the expelled respiratory droplets. Large droplets (as defined above) within an aerosol plume are strongly affected by gravity; for example, 50- to 100-micron droplets typically

will travel only up to a couple of meters before they fall to the ground or land on another surface. In contrast, small droplets (as defined above) can remain airborne almost indefinitely under most indoor conditions and can travel with air currents long distances. Whatever their size, virus-containing droplets eventually encounter physical objects and surfaces (called fomites) and can settle there.

63.     Once expelled from the mouth and/or nose, aqueous droplets, including virus-containing ones, can attach to surfaces. The suspended viral particles can then themselves collide with the surface and nonspecifically adsorb to it (i.e., form a noncovalent chemical bond with the surface). Furthermore, the landed droplet's water will undergo evaporation, and eventually some fraction of the viral particles may end up being deposited onto the surface either directly or indirectly (i.e., through other solids contained in the droplet).

64.     There is a distinction between viral particles that are adsorbed to a host surface and those simply deposited onto it. In the former case, as stated above, there is an actual chemical bond between the viral particle and the surface; in this scenario, the virus particle is relatively hard to detach. In contrast, the deposition entails merely a physical presence of the viral particle on the surface and is more easily removed.

65.     In addition, there are various intermediate scenarios in between the virus being adsorbed and merely deposited. For example, some endogenous polymeric molecules present in respiratory droplets (such as polysaccharides and proteins) may act as a "bridge" binding the virus to the surface similar to the adhesive in paint. Also, electrostatic attraction between the surface and the viral particles may play a role in addition to basic gravity. Porous objects like fabrics and foam represent a special case because they may entrap viral particles, thus making them hard to access, inactivate, or remove. In this case, the original respiratory droplets are first absorbed by the fabric

or foam; once their water subsequently evaporates, the viral particles become embedded and entangled within the bulk of the object.

66.     The type of bond that forms between viral particles and physical objects varies depending on the type of object. The interaction of both the virus-containing respiratory aqueous droplets and the viral particles themselves with surfaces depends on the nature of the latter. For example, when it adheres to a clean glass (or another hydrophilic) surface, an aqueous droplet spreads out; this increases the droplet's footprint on the surface and facilitates evaporation of the moisture. In contrast, when an aqueous droplet lands on plastic objects (or other objects with hydrophobic or greasy surfaces), it beads up, thereby minimizing its contact area and diminishing the evaporation. Likewise, the viral particle's propensity to adsorb to a surface strongly depends on the nature of the latter: in general, one would expect the tendency of the viral particles to adsorb to be more pronounced in the case of hydrophobic, as opposed to hydrophilic, surfaces. Furthermore, whether an adhered (deposited, adsorbed, or in between) viral particle remains stuck to the surface and, if so, whether it retains its infectivity should depend on the properties of the host surface as well.

67.     Plaintiff's property and equipment contains a mix of the surfaces described above, as would be expected of all properties that fall within the proposed class(es).

68.     With respect to the retention of the viral particles on the surface, numerous additional factors (i.e., those besides the type of the host object) may have a substantial effect: how smooth and clean the surface is, temperature, relative humidity, and airflow (e.g., ventilation).

69.     The bond between viral particles and physical objects persists until broken through intervening forces.

70.     If left undisturbed, the virus-surface bond will persist. Whether adsorbed or simply physically deposited (and in various intermediate scenarios), viral particles will remain on the surface indefinitely if left undisturbed. Some studies suggest that SARS-CoV-2 can be detected on certain surfaces many weeks after infected persons have departed, with the SARS-CoV-2 virus remaining viable for seven days on a range of common surfaces, including plastic, stainless steel, glass, and wood; other researchers have found viable SARS-CoV-2 samples on glass, stainless steel, and paper currency for up to approximately a month under indoor conditions.

71.     Physical objects that have been altered through the formation of a bond with viral particles are dangerous. Humans can become infected by touching, or otherwise coming in contact with, an object to which viral particles have attached for as long as the virus remains infective. In fact, this is one of the three recognized main mechanisms of spreading COVID-19; the other two are a direct transmission from an infected person to people in close proximity via large respiratory droplets ("person-to-person transmission"; if inhaled, such large droplets deposit primarily in the upper airways of the head and neck) and also an indirect transmission via small aerosol particles traveling over long distances ("airborne transmission"; if inhaled, such small droplets deposit primarily in the lower respiratory tract). When a person touches a surface containing an infectious virus and then his/her mouth, eyes, or nose, the person may become infected.

72.     Airborne transmission can be exacerbated through HVAC systems that are defective and rendered unreasonably dangerous through the absorption and then redistribution of SARS-CoV-2 viral particles across entire buildings, with studies finding wide dispersion of the SARS-CoV-2 virus and confirmed presence on ceiling vent openings, vent exhaust filters, ductwork and other surfaces more than 50 meters from the original human source.

73.     By bonding with, and becoming part of, the property that it comes in contact with, the SARS-CoV-2 virus adversely alters the physical object. It also alters the premises in which that object is located, which is in the control of Plaintiff. Both the object and the building are transformed from safe for occupancy and commercial activity to property that is uninhabitable, unfit for its intended purpose, dangerous and, indeed, potentially deadly. In short, the property is physically damaged. And even the owners (and/or lessors) of personal property or buildings that are potentially infected by SARS-CoV-2 or under threat of infection from SARS-CoV-2 if used or occupied during a pandemic (such as the COVID-19 pandemic) have effectively incurred a loss to property, because – simply put – the personal property or buildings are no longer safe, habitable or fit for their intended purpose until the pandemic conditions have been controlled and ultimately eliminated.

### *Defendant's Knowledge of the Risks of a Pandemic*

74.     The actual and threatened presence of COVID-19 at Plaintiff's premises and on Plaintiff's equipment has rendered physical property and equipment on those premises damaged, unusable, unfit for intended function, and unsafe. It has impaired and diminished the value, utility, and normal function of those premises (including the physical property and equipment contained within them). In addition, individuals infected with COVID-19 have rendered Plaintiff's premises and equipment unusable and unsafe. These circumstances have caused and continue to cause and create the risk of direct physical loss of and damage to the covered premises, property, and equipment.

75.     Insurers like Defendant were warned about, and have been aware of for years, the potential impact of pandemics. There were many publicly available reports about the risk of pandemics – and what insurers should do – in the years leading up to the COVID-19 pandemic.

76.     For example, a March 2018 article on the 100th anniversary of the 1918 Spanish Flu pandemic noted: "Even with today's technology, a modern severe pandemic would cause substantive direct financial losses to the insurance community. In addition, indirect losses would be severe, most notably on the asset side of the balance sheet."[16]

77.     In addition, courts have for decades held that the presence of a hazardous substance in property, including the airspace within buildings, constitutes property damage within the meaning of property insurance policies. Courts have also held that the closure of property due to imminent risk of physical loss or damage constitutes direct physical loss of property. Upon information and belief, insurers like Defendant are aware of these decisions.

78.     The Insurance Services Office ("ISO"), an organization that provides policy writing services to insurers, has also recognized for years that a virus can constitute physical damage to property. Specifically, in 2006, it announced the submission of an exclusion of loss "due to disease-causing agents such as viruses and bacteria."

79.     In connection with circulating the virus exclusion, it sent the following statement to state insurance regulators:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

---

[16]  https://www.air-worldwide.com/publications/air-currents/2018/What-the-1918-Flu-Pandemic-Can-Teach-Todays-Insurers/

80.     Accordingly, since 2006 insurers have had the opportunity to incorporate – and many have incorporated – this standard virus exclusion in their policies in an effort to avoid covering loss due to a disease such as COVID-19.

81.     Despite the availability of a specific exclusion for viruses, Plaintiff's Policy contains no such exclusion.

82.     Since the pandemic started, many insurers, and likely Defendant, have added exclusions to their policy forms, like the one at issue here, that expressly exclude coverage for viruses or pandemics.  This reflects a clear admission that insurers recognized that viruses can cause direct physical loss or damage under policies without such an exclusion, like the Policy here.  At the very least, it is acknowledgement by the insurers that their policies are ambiguous.

## PLAINTIFF'S ARCH INSURANCE POLICY

83.     Defendant provided coverage to Plaintiff under the Policy, Policy No. SBIML0117301, for the term August 26, 2019 to August 26, 2020.

84.     A true and accurate copy of the Policy purchased by Plaintiff is attached hereto as Exhibit A. Defendant drafted the Policy.

85.     The Policy was in effect in March 2020, which is when Plaintiff's losses and damage caused by the presence of the Coronavirus and the COVID-19 pandemic first began. Such losses and damage are ongoing.

86.     Plaintiff is the Named Insured under the Policy.

87.     Plaintiff paid all premiums required by the Policy.

88.     Defendant is the effective and liable insurer of the Policy and policies meeting the class definition.

89.     The Policy and policies meeting the class definition are contracts of adhesion under Kentucky law. The Policy and policies meeting the class definition were prepared by Defendant, contain standard, boiler-plate language, and were sold to Plaintiff and other insureds on a take-it-or-leave-it basis without negotiation as to scope of coverages relevant here.

90.     Generally, under property insurance policies like those issued by Defendant to Plaintiff and class members, the insuring agreements provide coverage for all risks of physical loss or damage to property, unless specifically excluded.

91.     The Policy provides coverage for several different types of losses arising from COVID-19 that are relevant here, including, but not limited to, the following listed in the "Miscellaneous Articles for Sports Facility Equipment Coverage" form. Ex. A at 31-39.

92.     The "Sports Facility Equipment" coverage form provides coverage to Plaintiff for "loss of or damage to Covered Property from any of the Covered Causes of Loss." *Id.* at 32. "Covered Property" is defined as "property described in the Declarations that: a. You own; b. Is in your care, custody, or control." *Id.* The "Miscellaneous Articles Declarations" identifies the "Schedule of Covered Property" as "Sports Equipment and Contents Limit – 261 Ruccio Way, Lexington, KY, 40503." *Id.* at 30. Plaintiff is located at 261 Ruccio Way, Lexington, KY, 40503.

93.     The "Sports Facility Equipment" coverage form defines "Covered Causes of Loss" to be "Direct Physical Loss or Damage to Covered Property except those causes of loss listed in the Exclusions." Ex. A at 32. Thus, all risks not otherwise excluded are covered causes of loss.

94.     The "Sports Facility Equipment" coverage form contains two independent triggers of coverage. It insures against "physical loss" of property and, separately, against "damage" to property." *Id.* at 32.

20

95. As used in the "Sports Facility Equipment" coverage form, the term "physical loss" is separate, distinct, and has an independent meaning from the term "damage."

96. The Policy does not define the term "direct."

97. The Policy does not define the term "physical."

98. The Policy does not define the term "physical loss."

99. The Policy does not define the term "damage."

100. When undefined, the phrase "Direct Physical Loss or Damage" is susceptible to more than one reasonable interpretation. As such, it must be interpreted against the drafter and in favor of coverage consistent with the "all risks" nature of the Policy and "Sports Facility Equipment" coverage form.

101. The Policy was in effect in March 2020, which is when Plaintiff's losses and damage caused by the presence of the Coronavirus, COVID-19 and the ongoing pandemic first began (*i.e.*, on or about mid-March 2020). Such losses and damage are ongoing.

102. The Sports Facility Equipment coverage form provides coverage for physical loss or damage to sports equipment and contents of Plaintiff's facility located at 261 Ruccio Way, Lexington, Kentucky.

103. Plaintiff has incurred substantial covered losses as a consequence of loss or damage to its property as a result of direct exposure of (and actual adverse physical alteration of) its own covered property. This actual adverse physical alteration of its property as a result of the Coronavirus adhering to the property and resulting adverse alteration of the property, requires either remediation or disposal and replacement.

104. This coverage also extends to physical loss to covered property as a result of the threat of the Coronavirus / COVID-19 becoming present at Plaintiff's location and on covered

equipment and contents of such location, and the resulting danger posed by such equipment and contents becoming a disease vector for COVID-19. Such threat has caused covered loss.

105.    The Sports Facility Equipment coverage form also covers Plaintiff's losses of **"Business Income and Extra Expense"** as a result of the Coronavirus / COVID-19. *Id.* at 34-35.

106.    "Business Income" means "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred during the 'period of restoration;' and continuing normal operating expenses including payroll." *Id.* at 35.

107.    Plaintiff is entitled to recover any "Extra Expense" to "continue your normal operations" or "to minimize the suspension of your normal operations if you cannot continue them." *Id.*

108.    "Extra Expense" means "necessary expenses you incur during the 'Period of Restoration' that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss." *Id.* at 34. Plaintiff has suffered Business Income losses and incurred Extra Expense due to the presence and threat of COVID-19.

109.    Extra Expenses that Plaintiff has incurred as a direct result of COVID-19 include, but are not limited to, purchases of: additional personal protective equipment such as surgical masks, N95 masks, face shields, and additional cleaning materials.

110.    The "Period of Restoration" means the period of time that: "(a) Begins with the date of physical loss or damage caused by or resulting from any Covered Cause of Loss"; and "(b) Ends on the date when the property should be repaired, rebuilt or replaced with reasonable speed and similar quality." Ex. A at 35.

111.    The Policy does not define the term "repaired."

112. The phrase "Period of Restoration," as defined, is susceptible to more than one reasonable interpretation. As such, it must be interpreted against the drafter and in favor of coverage consistent with the "all risks" nature of the Policy and "Sports Facility Equipment" coverage form.

113. To date, Plaintiff's equipment and other contents of its facility remains impaired and not ready for operations under the same or equivalent physical operating conditions that existed prior to the initial loss and damage. As such, the Period of Restoration has not ended.

114. By its terms, the expiration of the Policy period does not limit the Period of Restoration under the Sports Facility Equipment coverage form. Ex. A at 35.

115. The Sports Facility Equipment coverage form further provides **"Civil Authority"** coverage. Ex. A at 35. Specifically, it covers "the actual loss of 'Business Income' you sustain and necessary 'Extra Expense' caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss." *Id.* Access to Plaintiff's property has been limited, restricted, and prohibited in part or in total due to the presence and threat of COVID-19.

116. The Civil Authority coverage applies separately with respect to each particular action of civil authority under the circumstances of Plaintiff's losses. Plaintiff is entitled to recover separately for each action of civil authority limiting, restricting, or prohibiting partial or total access to each particular covered location.

117. Coronavirus and COVID-19 caused direct physical loss of or damage to property throughout the cities, counties, states and county where Plaintiff's insured property is located, giving rise to the actions of civil authority in those cities, counties, states and country.

23

118.     As a result of the civil authority orders issued by national, state and local governments, each of which was issued in response to direct physical loss of or damage caused by the Coronavirus and COVID-19 to property in which Plaintiff has no ownership or possessory rights, access to Plaintiff's insured locations have been prohibited, causing the necessary suspension of Plaintiff's business activities at those locations and a Business Income loss.

119.     For example, by Executive Order signed March 17, 2020 by Kentucky Governor Andy Beshear, all public-facing businesses in Kentucky that encourage public congregation or, that by the nature of the service to the public, cannot comply with CDC guidelines concerning social distancing, shall cease in person operations. The effect of this and other relevant civil authority orders issued at various times beginning in March 2020 (each of which was issued in response to direct physical loss of or damage caused by the Coronavirus and COVID-19 to property that Plaintiff has no ownership or possessory rights) was to prohibit access to Plaintiff's insured premises and equipment, causing the necessary suspension (*i.e.*, slowdown or cessation) of Plaintiff's business activities at those locations and Plaintiff to sustain a Business Income loss.

120.     Plaintiff is entitled to recover its covered Civil Authority losses.

121.     Plaintiff submitted a claim to Defendant for coverage under the Policy, but Defendant has denied Plaintiff's claim.

## **CLASS ACTION ALLEGATIONS**

122.     Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3) and/or 23(c)(4), Plaintiff brings this action on behalf of itself and all others similarly situated, and seeks to represent the following nationwide classes:

> a.   **Nationwide Declaratory Judgment Class.**  All businesses that were covered
> as of March 2020 by one of the Defendant's policies that contains one or more

of the following provisions: Business Income, Extra Expense, or Civil Authority.

b. **Nationwide Breach / Anticipatory Breach Class.** All businesses that were covered as of March 2020 by one of the Defendant's policies that contains one or more of the following provisions: Business Income, Extra Expense, or Civil Authority.

c. **Kentucky Subclass.** All businesses in Kentucky that were covered as of March 2020 by one of Defendant's policies that contains one or more of the following provisions: Business Income, Extra Expense, or Civil Authority.

Excluded from the Class is the Defendant, any entity in which the Defendant has a controlling interest, any of the officers, directors, or employees of the Defendant, the legal representatives, heirs, successors, and assigns of the Defendant, anyone employed with Plaintiff's counsel's firms, and any Judge to whom this case is assigned, and his or his immediate family.

123. Plaintiff's Classes satisfy the numerosity, commonality, typicality, adequacy, and superiority requirements of a class action under Rule 23, as set forth more fully herein.

124. **Numerosity**. COVID-19 has impacted thousands of businesses across the country and Defendant is a nationwide insurer with, on information and belief, thousands or more policies issued with the relevant provisions. Consequently, the Classes each number most likely in the thousands, and thus the numerosity standard is satisfied. Moreover, because the members of the Classes are geographically dispersed across the country, and members of the Kentucky Subclass are geographically dispersed across the state, if not elsewhere, joinder of all Class members in a single action is impracticable. Class members and Kentucky Subclass members may be informed

of the pendency of this class action through direct mail or other means based on Defendant's records of its policyholders.

125. **Commonality**. There are questions of fact and law common to the Classes that predominate over any questions affecting only individual members. The questions of law and fact common to the Classes arising from Defendant's actions include, without limitation, the following:

a. Can the actual presence of the SARS-CoV-2 virus or COVID-19 disease cause direct physical loss of or damage to property within the meaning of the policies at issue?

b. Can the imminent threat posed by the presence of the SARS-CoV-2 virus or COVID-19 disease cause direct physical loss of or damage to property within the meaning of the policies at issue?

c. Does the threat of physical exposure of property to the SARS-CoV-2 virus or COVID-19 disease render such property unreasonably dangerous and/or unfit for its ordinary intended purpose, thereby constituting direct physical loss of or damage to property within the meaning of the policies at issue?

d. Does the actual or suspected exposure of property to the SARS-CoV-2 virus or COVID-19 disease constitute direct physical loss of or damage to property within the meaning of the policies at issue?

e. Does the SARS-CoV-2 virus bond with, and become part of, the property that it comes in contact with, thereby adversely altering the physical object, as well as the building in which that object is located, by transforming the property from safe for occupancy and commercial activity to property that is, in whole or in part, uninhabitable, unfit for its intended purpose, dangerous, and, indeed, potentially deadly?

f. Whether and under what circumstances the Business Income, Extra Expense, and Civil Authority coverages in the policies at issue are triggered by a claim arising from the SARS-CoV-2 virus and COVID-19 pandemic.

g. In addition to or as an alternative to other evidence, given the WHO's declaration of a pandemic on March 11, 2020 and other available data and evidence about the presence of the Coronavirus and its community transmission, does a presumption exist that the COVID-19 disease and its causative Coronavirus was present or imminently present everywhere as of that time?

126. **Predominance.** The questions set forth above predominate over any questions affecting only a particular individual, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness, and equity to other available methods for the fair and efficient adjudication of the claims asserted herein. Specifically, thousands of businesses are similarly impacted by Defendant's failure and refusal to acknowledge coverage under the policies at issue for claims arising from the SARS-CoV-2 virus and COVID-19 pandemic.

127. **Typicality.** Plaintiff's claims are typical of those of the Classes as Plaintiff was subject to the same or similar policy provisions and the damages and losses for all class members arise from assertion of claims under the same legal theories based on a common factual predicate associated with the SARS-CoV-2 virus and COVID-19 pandemic.

128. **Superiority.** A class action is the appropriate method for the fair and efficient adjudication of this controversy. Defendant has acted or refused to act on grounds generally applicable to the Classes. The presentation of separate actions by individual Class members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendant, and/or substantially impair or impede the ability of Class members to protect their interests.

129. **Adequacy.** Plaintiff is an adequate representative of the Classes because it is a members of the Classes and its interests do not conflict with the interests of those it seeks to represent. The interests of the Class members will be fairly and adequately protected by Plaintiff and its counsel, who have extensive experience prosecuting complex class litigation.

130. **Declaratory Relief and certification under Rule 23(b)(2) of the Federal Rules of Civil Procedure**. On information and belief, Defendant has refused, or intends to refuse, to acknowledge coverage on claims of similarly situated class members under the same or

27

substantially similar policies. Accordingly, final injunctive and/or declaratory relief mandating that Defendant cover the common losses of Class members is appropriate respecting the class as a whole.

131. **Issue Class and Modification of Class Definitions and Creation of Subclasses**. Plaintiff reserves the right to seek certification of one or more common issues pursuant to Rule 23(c)(4). In addition, as necessary and appropriate, Plaintiff reserves the right to modify the definitions of the class and/or create subclasses either by amendment to the complaint or by motion for class certification based on discovery and further investigation.

## COUNT I: DECLARATORY JUDGMENT
### (Individually and on behalf of Nationwide Declaratory Judgment Class and Kentucky Subclass)

132. The preceding paragraphs are incorporated by reference as if fully alleged herein.

133. The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

134. The Policy constitutes a written contract under which the Defendant agreed, in consideration of the premium paid, to provide coverage to Plaintiff for Business Income losses and Extra Expense.

135. Plaintiff submitted a claim for physical loss of or damage to its property and business interruption as well as other covered losses arising from the Coronavirus and the COVID-19 pandemic (which are still ongoing), asking for Defendant's confirmation as to coverage with respect to each and every potentially applicable basis for coverage under all provisions of the Policy.

136. Defendant failed and refused to acknowledge coverage on Plaintiff's claim under the Policy, stating that the presence of the COVID-19 virus "does not constitute 'physical loss of

28

or damage to' property." Upon information and belief, Defendant is taking (or will take) the same position with other similarly situated businesses asserting a claim for coverage arising out of the Coronavirus and the COVID-19 pandemic. Plaintiff disagrees with Defendant's coverage position and alleges that the Policy's Business Income, Extra Expense, and Civil Authority coverages have been (and continue to be) triggered by Plaintiff's claim arising from the Coronavirus and the ongoing COVID-19 pandemic.

137.    Thus, an actual controversy has arisen and now exists between Plaintiff, individually and on behalf of a class of similarly situated businesses, on the one hand, and Defendant, on the other hand, concerning the respective rights and duties of the parties under the Policy and whether the Policy provides coverage for Plaintiff's claim arising from the Coronavirus and the ongoing COVID-19 pandemic.

138.    The Court has the authority to issue a declaratory judgment concerning the respective rights and obligations of the parties under the Policy.

139.    Plaintiff, individually and on behalf of a class of similarly situated businesses, seeks a declaration as to the scope and breadth of the parties' rights and obligations under the Policy in connection with Plaintiff's ongoing Coronavirus and COVID-19 pandemic related losses and Defendant's failure and refusal to acknowledge coverage.

140.    Plaintiff, individually and on behalf of a class of similarly situated businesses, seeks a declaratory judgment declaring that the Policy's Business Income, Extra Expense, and Civil Authority coverages are triggered by Plaintiff's claims and that Defendant is responsible for fully and timely paying Plaintiff's claims, and all claims of similarly situated businesses.

### COUNT II: BREACH OF CONTRACT AND/OR ANTICIPATORY BREACH
**(Individually and on behalf of Nationwide Breach Class and Kentucky Subclass)**

141.    The preceding paragraphs are incorporated by reference as if fully alleged herein.

29

142.     Plaintiff and other similarly situated businesses paid substantial premiums for their policies and Defendant's promises of coverage contained therein, and otherwise performed all of their obligations owed under their policies or were excused from performance.

143.     The Policy is a valid and enforceable contract between the parties. All conditions precedent under the Policy have been satisfied or excused, or Defendant has waived or is estopped from enforcing all conditions precedent under the policies at issue.

144.     Defendant has failed and refused to acknowledge coverage, pay or otherwise honor its promises with respect to Plaintiff and other similarly situated businesses' claims under the policies for coverage of losses arising from the Coronavirus and the COVID-19 pandemic. In doing so, Defendant has breached (or intends to breach – as such an anticipatory breach) its contract with Plaintiff and other similarly situated businesses. As a result, Plaintiff and other similarly situated businesses have suffered and continue to suffer damage in an amount to be proven at trial, but currently estimated to far exceed the jurisdictional required amount in controversy (in excess of $75,000 as to Plaintiff; and in excess of $5 million as to the class, exclusive of interest and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, request relief and judgment against Defendant as follows:

a.     That the Court enter an order certifying the class, appointing Plaintiff as the representative of the class, appointing Plaintiff's counsel as class counsel, and directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class;

b.     For a judgment against Defendant for the causes of action alleged against it;

c.     For compensatory damages in an amount to be proven at trial;

d.     For a declaration that Defendant's conduct as alleged herein is unlawful and in material breach of the Policy;

e.     For appropriate injunctive relief, enjoining Defendant from continuing to engage in conduct related to the breach of the Policy;

f.     For pre-judgment and post-judgment interest at the maximum rate permitted by law;

g.     For Plaintiff's attorney's fees;

h.     For Plaintiff's costs incurred; and

i.     For such other relief in law or equity as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.


Date: February 16, 2021                    Respectfully submitted,

                                           **STUEVE SIEGEL HANSON LLP**

                                           *s/ Patrick J. Stueve*
                                           Patrick J. Stueve, MO #13847
                                           Bradley T. Wilders, MO # 78301
                                           Curtis Shank, MO #66221
                                           Abby E. McClellan, MO #66069
                                           460 Nichols Road, Suite 200
                                           Kansas City, Missouri 64112
                                           Telephone:     816-714-7100
                                           Facsimile:     816-714-7101
                                           Email:         stueve@stuevesiegel.com
                                           Email:         wilders@stuevesiegel.com
                                           Email:         shank@stuevesiegel.com
                                           Email:         mcclellan@stuevesiegel.com

                                           **MILLER SCHIRGER LLC**

                                           John J. Schirger, MO #60583
                                           Matthew W. Lytle, MO #59145
                                           Joseph M. Feierabend, MO #62563

31

4520 Main Street, Suite 1570
Kansas City, MO 64111
Telephone:     (816) 561-6500
Facsimile:     (816) 561-6501
Email:          jschirger@millerschirger.com
Email:          mlytle@millerschirger.com
Email:          jfeierabend@millerschirger.com

**LANGDON & EMISON LLC**

J. Kent Emison, MO #29721
911 Main Street
PO Box 220
Lexington, Missouri 64067
Telephone:     (660) 259-6175
Facsimile:     (660) 259-4571
Email:          kent@lelaw.com

**SHAFFER LOMBARDO SHURIN, P.C.**

Richard F. Lombardo, MO #29748
2001 Wyandotte Street
Kansas City, MO 64108
Telephone:     816-931-0500
Facsimile:     816-931-5775
Email:          rlombardo@sls-law.com

**WOLTERMAN LAW OFFICE**
Matthew Metzger, Ohio 0082235, (*Pro Hac Vice*
pending)
434 W. Loveland Ave.
Loveland, OH 45150
Telephone:     513-488-1135
Email:          matt@woltermanlaw.com

*Attorneys for Plaintiff and the Proposed Classes*

32